FILED
CLERK

11:53 am, Jan 31, 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
JOSEPH A. FERRARA, SR., FRANK H.
FINKEL, MARK HERBST, DENISE
RICHARDSON, THOMAS F. CORBETT,
THOMAS GESUALDI, LOIS BISIGNANO,
MICHAEL O'TOOLE, MICHAEL C.
BOURGAL and DARIN JEFFERS, as Trustees
and Fiduciaries of the Local 282 Pension Trust
Fund,

                 Plaintiffs,

          -against-

HAPPY TIME TRUCKING, LLC a/k/a HAPPY
TIME TRUCKING, INC., T.E.V. CORP., and
JOHN DOE COMPANIES 1–99,

                 Defendants.
----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:17-cv-7450 (ADS) (AKT)

**APPEARANCES:**

**Cohen, Weiss and Simon LLP**
*Attorneys for the Plaintiff*
900 Third Ave, 21th Fl.
New York, NY 10022
      By:   Michael Seth Adler, Esq.,
             Erika Medina, Esq.,
             Joseph J. Vitale, Esq., Of Counsel.

**Chiesa Shahinian & Giantomasi**
*Attorneys for the Defendants*
One Boland Drive
West Orange, NJ 07052
      By:   Ronald L. Tobia, Esq.
             Othiamba Nkosi Lovelace, Esq., Of Counsel.

**SPATT, District Judge**:

     Plaintiffs Joseph A. Ferrara, Sr., Frank H. Finkel, Mark Herbst, Denise Richardson,

Thomas F. Corbett, Thomas Gesualdi, Lois Bisignano, Michael O'Toole, Michael C. Bourgal,

1

and Darin Jeffers, members of the Teamsters Union (the "Union"), as Trustees and Fiduciaries of the Local 282 Pension Trust Fund (the "Plaintiffs") brought this Employee Retirement Income Security Act ("ERISA") action against Happy Time Trucking, LLC a/k/a Happy Time Trucking, Inc. ("Happy Time"), T.E.V. Corp. ("TEV"), and John Doe Companies 1–99 (the "Defendants") to recover withdrawal liability payments owed to the Plaintiffs' Local 282 Pension Trust Fund (the "Fund"). The Plaintiffs now move under Federal Rule of Civil Procedure ("FED. R. CIV. P.") 56 for summary judgment, and that motion is presently before the Court. They also ask that the Court dismiss the action, without prejudice, as to the John Doe Defendants.

This opinion's background section first summarizes the history of the Defendants' participation in the Fund, including the events leading to the alleged withdrawal liability. The background section then describes the present action. For the following reasons, the Court grants the Plaintiffs' motion for summary judgment, dismisses the action without prejudice as to the John Doe Defendants, and refers the matter to a magistrate judge for a calculation of damages, attorneys' fees, and costs.

## I.     BACKGROUND

Unless otherwise noted, the following facts are undisputed and are drawn from the parties' Local Rule 56.1 statements.

### A.  The Fund and the Defendants' Business Operations

A board of trustees, comprised of labor and management representatives, administers the Fund pursuant to "Restated Agreements and Declarations of Trust" (the "Trust Agreements"), for the purposes of collecting contributions from employers and providing benefits to eligible participants. Defendants Happy Time and TEV are New Jersey corporations licensed to do business at the same address in Newark.

Christopher and Anthony Vaughan each own 50 percent of Happy Time; they each own 26 percent of TEV, and their mother, Angela Vaughan, owns the other 48 percent, though only the Vaughan brothers actively manage both companies.

As to the Defendants' involvement with the Union's collective bargaining agreements, the parties disagree as to certain facts. The Plaintiffs assert that Happy Time was a party to the following contracts, which bound Happy Time to the Trust Agreements: (a) the Metropolitan Trucker's Association Contract with the Union, in effect from July 1, 2006 through June 30, 2009 (the "2006 MTA CBA"); (b) the New York City Heavy Construction and Excavating Contract with the Union, in effect from July 1, 2006 through June 30, 2009 (the "2006 NYC Heavy CBA"); and (c) the Metropolitan Trucker's Association Contract with the Union, in effect from July 1, 2009 through June 30, 2012 (the "2009 CBA"). ECF 33-3 at 4–5.

The Defendants dispute these allegations to the extent that they allege that Christopher Vaughan agreed that Happy Time was a party to the CBAs. Instead, they claim that Christopher Vaughan "testified that he had never seen the CBAs before"; that Christopher Vaughan only acknowledged that a man named John Farnsworth signed the 2006 MTA CBA and 2006 NYC Heavy CBA; and that it was "unclear if Mr. Farnsworth had the authority to sign the CBAs." ECF 25-1 at 4–5.

TEV is a trucking company that does business in the New York City area. Its employees would haul materials to and from job sites, such as contaminated soil, with the Defendants noting that TEV specialized in hauling salt, unlike Happy Time. ECF 25-1 at 9. Carol Cordero is TEV's bookkeeper, a position she has held since 1998, and she and Christopher Vaughan would maintain TEV's books. Drivers for Happy Time and TEV would call the same number to speak to the companies' staff and they would park their trucks at the same address in New Jersey. The

parties agree that several individuals worked for both companies, and that some employees would use the same truck when driving for both companies.

## B. The Alleged Withdrawal Liability

The Plaintiffs allege that on or about June 30, 2012, Happy Time "permanently ceased all operations under the CBAs and/or permanently ceased to have an obligation to contribute to the Fund, thereby completely withdrawing from the Fund." ECF 33-3 at 5. The Defendants claim that the record is unclear as to exactly when Happy Time ceased operations that would have been covered under the CBAs, though they do admit that Happy Time ceased operations sometime after the 2011 death of Tommy Vaughan, Christopher and Anthony Vaughan's father. ECF 25-1 at 5; ECF 33-17 at 233–34 (Dep. of Christopher Vaughan).

By letter dated November 10, 2015, the Fund notified Happy Time that it had effectuated a withdrawal from the fund. Upon determining the amount of withdrawal liability that Happy Time incurred, the Fund sent the Defendants a January 22, 2016 letter (the "First Notice and Demand"), alleging that Happy Time had withdrawn from the Fund and that the Defendants were liable for $4,175,485 in withdrawal liability. Also in the First Notice and Demand, the Fund provided a schedule for 58 monthly payments, and demanded payment in accordance with the schedule. It later wrote to the Defendants in March 2016 saying that it had not received payment. Happy Time sent a letter to the Fund on March 4, 2016 in which it contested the withdrawal liability amount; requested trustee review; and asked for various plan documents. The Fund Administrator provided Happy Time with the requested documents, and the Fund reviewed its initial assessment of the Defendants' withdrawal liability.

Following this review, the Fund notified the parties by letter dated July 14, 2016 (the "Second Notice and Demand"), that Happy Time had withdrawn from the Fund and that the

Defendants were liable for $2,717,684 in withdrawal liability, and again set forth a monthly payment schedule. On September 12, 2016, Happy Time advised the Fund that it intended to negotiate a new CBA with the Union, which it believed it should result in Happy Time incurring no withdrawal liability. Neither Happy Time nor TEV signed a CBA with the Union following the September 12, 2016 letter.

In October 2017, the Fund notified the Defendants that it had yet to receive payment as requested in the Second Notice and Demand. It warned the Defendants that failure to pay within 60 days would result in a default on the withdrawal liability. The Plaintiffs allege that Christopher Vaughan and TEV's bookkeeper Cordero reviewed this letter, ECF 33-1 at 7, but the Defendants deny this, ECF 25-1 at 7. In any event, the Defendants did not make any withdrawal liability payments within 60 days.

## C. The Present Action

The Plaintiffs brought the present action in December 2017. ECF 1. They raised two causes of action. First, they claimed that the Defendants failed to make withdrawal liability payments within 60 days and were thus in default within the meaning of ERISA § 4219(c)(5)(A), 29 U.S.C. § 1399(c)(5)(A), and that the Fund was entitled to immediate payment. *Id.* at 10–11. Second, they alleged that Defendant TEV was jointly and severally liable for Happy Time's withdrawal liability because of its "single entity, alter ego, single employer, and/or joint employer relationship with Happy Time." *Id.* at 11.

The Plaintiffs asked for a declaration that the two companies are under common control and that they are a single entity so that they are jointly and severally liable for Happy Time's withdrawal liability. They also asked for $2,717.684 in withdrawal liability principal; interest on the withdrawal liability principal at the rate of 18 percent annually, pursuant to ERISA

§§ 502(g)(2)(B) and 4301(b), 29 U.S.C. §§ 1132(g)(2)(B), and 1451(b), and the Trust Agreement; an order that the Defendant companies pay an amount equal to the greater of the 18 percent interest rate or an amount not to exceed 20 percent of the withdrawal liability pursuant to ERISA §§ 502(g)(2)(C) and 4301(b), 29 U.S.C. §§ 1132(g)(2)(C), and 1451(b), and the Trust Agreement; and attorneys' fees and costs. *Id.* at 11–12.

Presently before the Court is a motion for summary judgment by the Plaintiffs. ECF 33.

## II. DISCUSSION

### A. The Legal Standard

Rule 56(a) provides that a court may grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"A genuine issue of fact means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Wright v. Goord*, 554 F. 3d 255, 266 (2d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "The evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Wright*, 554 F.3d at 266 (parenthetically quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). However, to defeat a motion for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts," and the party "may not rely on

conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal quotation marks omitted).

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

### B. Application to the Facts of This Case

The Plaintiffs assert that Happy Time is liable for the withdrawal liability principal, and that it has waived the right to contest the mathematical accuracy of the alleged $2.7 million in liability, because Happy Time failed to dispute its status as an employer under ERISA; the Fund notified it of its withdrawal liability; and it never initiated arbitration over the withdrawal liability or requested a review from the Fund. ECF 33-2 at 10–13.

They also contend that the Defendant companies are jointly and severally liable for the withdrawal liability because they are members of the same controlled group. *Id.* at 13. In support of their controlled group argument, the Plaintiffs allege that the same two individuals—Christopher Vaughan and Anthony Vaughan—controlled 100 percent of Happy Time, 52 percent of TEV, and 100 percent of the voting authority for TEV, because their mother Angela—who owns the other 48 percent of TEV—does not play a management role in the company. *Id.* at 13–16. The Plaintiffs also allege that Happy Time and TEV are jointly and severally liable because of their single employer and *alter ego* relationship. *Id.* at 17–21.

With regard to the John Doe Defendants, the Plaintiffs allege that they have yet to identify any other companies under common control with Happy Time or TEV. *Id.* at 16–17. They ask that if the Court grants the motion for summary judgment, that it also dismiss the

claims against the John Doe Defendants without prejudice and with leave to re-file in the event that the Plaintiffs identify such companies in post-judgment discovery. *Id.* at 17.

The Plaintiffs further argue that they are entitled to damages pursuant to ERISA and the Trust Agreement. *Id.* at 21. Those damages include the withdrawal liability principal; pre- and post-judgment interest; liquidated damages; and attorneys' fees and costs. *Id.* at 22–23.

In opposition, the Defendants do not contest Happy Time's withdrawal liability. *See generally* ECF 34. Instead, they contend that TEV never signed a CBA with the Union; thus, it was not obligated to contribute to the Fund, and it did not need to submit to arbitration in order to contest liability. *Id.* at 2–6. The Defendants also argue that TEV and Happy Time are not jointly and severally liable because they are not part of a controlled group; they do not share a single employer; and they are not *alter egos* of one another. *Id.* at 6–8. They allege that, if anything, "TEV may have engaged in activities that could be considered that of a joint employer with Happy Time," which would not impose an obligation for TEV to contribute to the Fund. *Id.* at 7.

In their reply, the Plaintiffs note that the Defendants failed to challenge Happy Time's liability. ECF 35 at 2. They also assert that TEV is part of Happy Time's controlled group because the same two individuals control 100 percent of both companies' voting stocks, and they further argue that insufficient commonality in actual stock ownership is "irrelevant." *Id.* at 2–3. They add that as a member of Happy Time's controlled group, TEV was obligated to arbitrate withdrawal liability disputes "within the same statutory timeframe as signatory employers." *Id.* at 3–4. The Plaintiffs also allege that the Defendants cited to facts that are irrelevant to the determination of single employer and *alter ego* liability. *Id.* at 4–5.

The Court addresses the above-noted issues in the following order: Happy Time's liability; the request as to the John Doe Defendants; whether the Defendant companies are jointly and severally liable; and damages.

### 1. Happy Time's Liability

In their opposition, the Defendants do not challenge the liability of Happy Time. This lack of an opposition, standing alone, does not justify granting summary judgment, because a district court "must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (per curiam).

"Withdrawal liability is part of a comprehensive legislative scheme designed to address the adverse consequences that arise when individual employers terminate their participation in, or withdraw from, multiemployer pension plans." *Burke v. Hamilton Equip. Installers, Inc.*, No. 02-CV-519, 2006 WL 3831380, at *4 (W.D.N.Y. Oct. 16, 2006); *see Gesualdi v. Seacost Petrol. Prods., Inc.*, 97 F. Supp. 3d 87, 97 (E.D.N.Y. 2015) (Spatt, *J.*). "Withdrawal from a multiemployer pension plan occurs when an employer 'permanently ceases to have an obligation to contribute under the plan, or permanently ceases all covered operations under the plan.'" *Daniello v. Planned Sys. Integration, Ltd.*, No. 07-CV-1729, 2009 WL 2160536, at *2, 2009 U.S. Dist. LEXIS 132835, at *4 (E.D.N.Y. June 25, 2009) (Pohorelsky, M.J.), *adopted by*, 2009 U.S. Dist. LEXIS 61387 (July 17, 2009) (quoting 29 U.S.C. § 1383)).

"'Congress determined that unregulated withdrawals from multiemployer pension plans could endanger their financial vitality and deprive workers of . . . vested [pension] rights . . . .'" *id.* at *4, 2006 U.S. Dist. LEXIS at *11–12 (quoting *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 227–28, 106 S. Ct. 1018, 1019, 89 L. Ed. 2d 166 (1986)). As a result, "[i]f

an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under [ERISA] to be the withdrawal liability." *Gesualdi*, 97 F. Supp. 3d at 97 (internal quotation marks omitted).

"Following withdrawal from a plan, the fund is vested with authority to determine the amount of withdrawal liability. It must then notify the withdrawing employer of its withdrawal liability, set a payment schedule, and formally demand payment." *Burke*, 2006 WL 3831380, at *4 (citing 29 U.S.C. §§ 1382, 1399); *see Daniello*, 2009 WL 2160536, at *3 ("Once an employer has withdrawn from a plan, the sponsor of the plan determines the amount of the withdrawal liability . . . and notifies the withdrawing employer of that amount and provides an amortized payment schedule." (citations omitted)). "After receiving notice of withdrawal liability from the plan, an employer must make payments according to the plan's payment schedule within 60 days of receiving the plan's demand for withdrawal liability." *Daniello*, 2009 WL 2160536. at *3. "Various statutory provisions afford the employer an opportunity to challenge the plan's assessment of the employer's liability, or to request more information." *Id.* (citing 29 U.S.C. § 1399(b)(2) (providing, in part, that within 90 days of receiving the notice, the employer may request that the plan sponsor review specific matters relating to the determination of the employer's liability and the schedule of payments); *id.* § 1401).

If the employer fails to make payments consistent with the above-noted procedure, the plan sponsor must again notify the employer of its default and, if not cured within 60 days of receiving notice of nonpayment, "the fund is entitled to immediate payment of the employer's entire withdrawal liability, in addition to accrued interest on the total outstanding liability." *Id.* at *3; *see* 29 U.S.C. § 1399(c)(5) (providing that in the event of a default, the plan sponsor "may require immediate payment of the outstanding amount of an employer's withdrawal liability,

plus accrued interest on the total outstanding liability from the date due of the first payment which was not timely made.").

"Under the structure of ERISA, any disputes over an employer's withdrawal liability are to be resolved through arbitration. Either party may initiate arbitration within 60 days after either (1) the date the employer is notified of its liability or (2) 120 days after the employer contacts the plan sponsor about any disputes or requests for review of its withdrawal liability." *Vacca v. Bridge Chrysler Jeep Dodge, Inc.*, No. 06-CV-3543, 2008 WL 4426875, at *6 (citing 29 U.S.C. § 1401(a)). "If neither party initiates an arbitration proceeding pursuant to [ERISA], 'the amounts demanded by the plan sponsor under section 1399(b)(1) [there]of . . . shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in State or Federal court of competent jurisdiction for collection." *Id.* at *6. "[I]f an employer fails to initiate the arbitration process to contest the amount of withdrawal liability assessed against it, the employer has waived its right to arbitration, and a federal court will not make an independent determination that the plan sponsor's assessment was unreasonable." *Id.* at *6.

In addition, "ERISA provides that '[i]n any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of Section 1145 of this title).'" *Id.* (quoting 29 U.S.C. § 1451(b)).

The record reflects that Happy Time was an ERISA employer, in that it had signed multiple CBAs with the Union that obligated it to contribute to the Fund. *See, e.g.*, *In re Halpin*, 566 F.3d 286, 292 (2d Cir. 2009); *Olivieri v. P.M.B. Const., Inc.*, 383 F. Supp. 2d 393, 403–04 (E.D.N.Y. 2005). The Plaintiffs have provided copies of the various CBAs. ECF 33-5, 33-6.

The Vaughan brothers and Carol Cordero—TEV's bookkeeper—testified at depositions that Happy Time performed union work. ECF 33-16, 33-17. Further, the Plaintiffs provided adequate notice to the Defendants. Even though the Defendants claimed not to have received the Second Notice and Demand from the Plaintiff, "'[s]everal courts have held that the filing of a civil complaint can constitute sufficient notice under § 1399.'" *Labarbera v. United Crane and Rigging Servs., Inc.*, No. 08-CV-3274, 08-CV-3983, 2011 WL 1303146, at *3 (E.D.N.Y. Mar. 2, 2011) (quoting *Amalgamated Lithographers of Am. v. Unz.*, 670 F. Supp. 2d 214, 225 (S.D.N.Y. 2009)).

The Plaintiffs also allege that the Defendants have waived the right to contest withdrawal liability. If an ERISA employer fails to initiate arbitration, it waives its rights to challenge the amount of withdrawal liability against it and fixes the amount of withdrawal liability. *Trs. of Local 813 Ins. Tr. Fund v. Rogan Bros. Sanitation, Inc.*, No. 12-CV-6249, 2018 WL 1587058, at *13 (S.D.N.Y. Mar. 28, 2018); *United Food & Commercial Workers Local 348 Pension Fund v. Franklin Poly Corp.*, No. 12-CV-5837, 2013 WL 4525658, at *5 (E.D.N.Y. Aug. 27, 2013). Again, the Plaintiffs have shown that Happy Time did not seek arbitration to challenge the withdrawal liability. Accordingly, Defendant Happy Time is liable to the Plaintiffs in the amount of $2,717,684 in withdrawal liability principal.

### 2. The John Doe Defendants

In addition, the Court grants the Plaintiffs' motion to dismiss, without prejudice, the complaint as to the John Doe Defendants. The Plaintiffs may re-file the complaint as to those Defendants in the event that they are identified in post-judgment discovery. *See, e.g.*, *Cox. v. Vill. of Pleasantville*, 271 F. Supp. 3d 591, 618 (S.D.N.Y. 2017) ("'Because [the] plaintiffs have failed to timely identify and serve the John Doe defendants, [the] plaintiffs' claims against both

John Doe defendants are dismissed.'") (quoting *Kaczmarek v. City of Schenectady*, No. 10-CV-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013)).

### 3. TEV's Liability

The record repeatedly shows that Happy Time ceased operations at some point prior to Tommy Vaughan's August 2011 death. The Plaintiffs do not contend that TEV was an ERISA employer. Thus, in order to recover the withdrawal liability, the Plaintiffs seek to hold TEV jointly and severally liable, either under the controlled group standard; the single employer standard; or the *alter ego* standard. The Court addresses each of these theories in turn.

#### a. The Controlled Group Standard

Under the Multiemployer Pension Plan Amendments Act ("MPPAA"), "all businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another." *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 285 (2d Cir. 2010) (internal quotation marks omitted). The Second Circuit has ruled that "a showing that multiple corporations are under 'common control' within the meaning of specified Treasury regulations (*i.e.*, 26 C.F.R. §§ 1.414(c)–1 through 1.414(c)–5), will suffice to make each entity in that 'controlled group' responsible for the withdrawal liability of any of the entities so obligated." *Trs. of the Local 813 Pension Tr. Fund v. Canal Carting, Inc.*, No. 12-CV-0060, 2014 WL 843244, at *11 (E.D.N.Y. Mar. 3, 2014) (Report & Recommendation) (citing *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 86 (2d Cir. 1997)). Under these regulations, businesses are under common control if they are "members of a 'parent-subsidiary' or 'brother-sister' groups of businesses." *Ferrara v. Smithtown Trucking Co., Inc.*, 29 F. Supp. 3d 274, 286 (E.D.N.Y. 2014) (quoting 29 C.F.R. § 1.414(c)–2).

The Plaintiffs allege that TEV and Happy Time are in the brother-sister controlled group. ECF 33-2 at 14. Brother-sister corporations are "two or more corporations (i) where the same five or fewer persons own a controlling interest in each organization, and (ii) such persons are in effective control of each organization, taking into account the ownership of each person only to the extent such ownership is identical with respect to each such organization." *Id.* at 286 (citing 29 C.F.R. § 1414(c)–2(c). A "controlling interest" is defined "as ownership of stock processing at least 80 percent of the total combined voting power of all classes of stock entitled to vote of such corporation, or at least 80 percent of the total value of shares of all classes of stock of such corporation." *Id.* (internal quotation marks omitted); *see Gesualdi v. Nacirema Indus. Inc.*, No. 16-CV-4159, 2017 WL 9487171, at *3 (E.D.N.Y. Aug. 31, 2017) (Lindsay, M.J.), *adopted by*, 2017 WL 4326049, at *3 (E.D.N.Y. Sept. 28, 2017). Thus, "a 'brother-sister' group of businesses under common control must be controlled by the same five or fewer persons owning at least 80 percent of the shares of each corporation, with at least 50 percent of the shareholder's ownership interests in each corporation identical." *Ferrara*, 29 F. Supp. 3d at 286.

As to the effective control prong, courts examine the owners' "identical interests" in each corporation. *See Gesualdi v. Nacerima Indus. Inc.,* No. 16-CV-4159, 2017 WL 4326049, at *2 (E.D.N.Y. Sept. 28, 2017). They calculate identical interests "by adding the minimal ownership interests identical in each principal." *I.L.G.W.U. Nat'l Ret. Fund. v. ESI Grp., Inc.*, No. 92-CIV-0597, 2002 WL 999303, at *7 n.4 (S.D.N.Y. May 15, 2002). Thus, "if Shareholder A owns 20% of corporation X, 20% of Corporation Y, and 10% of Corporation Z, Shareholder A's identical interest is 10%." *Id.* (citing 26 C.F.R. § 1.414(c)–2(c)(2)(i)).

The Court rules that the Plaintiffs have established a brother-sister controlled group between Happy Time and TEV, because they have alleged that the Vaughan brothers own 100

percent of Happy Time, and 100 percent of TEV's actual voting power, despite only owning 52 percent of TEV. The brothers' *de facto* 100 percent voting power establishes the controlling interest prong. *See Nat'l Ret. Fund v. Caesars Entm't Corp.*, No. 15-CV-2048, 2016 WL 2621066 at *5 n.5 (S.D.N.Y. May 5, 2016) (recommending summary judgment and defining "controlling interest" as possessing 80 percent of the "combined voting power of all classes of stock") (Cott, M.J.), *adopted by,* 2016 WL 6601561 (S.D.N.Y. Nov. 7, 2016); *Ferrara*, 29 F. Supp. 3d at 286–87. Their 52 percent ownership meets the effective control prong. *See Gesualdi*, 2017 WL 4326049, at *2. Thus, TEV is jointly and severally liable for Happy Time's withdrawal liability as a member of Happy Time's brother-sister controlled group.

Though this finding is sufficient to hold the Defendant companies jointly and severally liable, the Court proceeds to analyze the action under the single employer and *alter ego* standards.

### b. The Single Employer Standard

A CBA that binds one entity also binds a non-signatory entity if "(1) the two entities are a single employer and (2) the employees of the entities constitute a single appropriate bargaining unit." *Div. 1181 A.T.U.-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 910 F.3d 608, 617 (2d Cir. 2018) (internal quotation marks omitted) (citing *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001)). The hallmark of a single employer status is the "absence of an arms[-]length relationship found among unintegrated entities." *Brown*, 250 F.3d at 128 n.2. (internal quotation marks omitted). Courts consider several non-dispositive factors to determine if companies share a single employer: "interrelation of operations, common management, centralized control of labor relations[,] and common ownership." *Lihli Fashions Corp. v. NLRB*,

80 F.3d 743, 747 (2d Cir. 1996) (per curiam) (quotation marks omitted).  Also relevant are the entities' "use of common office facilities and equipment and family connections."  *Id.*

"[T]he determination that separate companies are a 'single employer' is not enough to bind all the separate companies to the collective bargaining agreements of any one of the companies.  Rather, something more must be shown."  *Id.* at 748.  For one company to be bound by a CBA made by another company, it must be shown not only that they are a single employer, but additionally, that together they represent an appropriate employee bargaining unit.  *Ferrara v. Oakfield Leasing Inc.*, 904 F. Supp. 2d 249, 261 (E.D.N.Y. 2012) (Spatt, *J.*) (citing *S. Prairie Constr. Co. v. Local No. 627*, 425 U.S. 800, 804–05, 86 S. Ct. 1842, 1844–85, 48 L.Ed.2d 382 (1976) (per curiam) and *Local One v. Stearns & Beale, Inc.*, 812 F.2d 763, 769 (2d Cir. 1987)).

With regard to the interrelation of operations, courts consider the following factors when analyzing the separate corporate entities: "(1) involvement in daily production, distribution, marketing, and advertising decisions; (2) sharing of employees, services, records, and equipment; (3) comingling of bank accounts, inventories, and lines of credit; (4) maintenance of corporate records; and (5) preparing and filing of tax returns."  *Id.* (internal quotation marks omitted).  In this case, the deposition testimony reveals that the parties kept separate offices, though they would often park trucks at the same facility, and the parties did not dispute that both companies were licensed to do business at the same address in Newark, New Jersey; while they shared several employees, the number of shared employees was unknown; they had different methods of payment; they hauled different materials and occasionally shared trucks; and while TEV's bookkeeper played a role in keeping Happy Time's records, she shared that role with an outside accountant.  ECF 33-16, 33-17.

This factor ultimately favors the Defendants, but by the slimmest of margins. The shared equipment, parking facility, employees and partially integrated bookkeeping suggests that the two entities should be treated as having a single employer. *See Bourgal v. Robco Contracting Enterprises, Ltd.*, 969 F. Supp 854, 858 (E.D.N.Y. 1997) (Spatt, *J.*) (holding that companies formed at different times with different offices were a single employer); *see also Fuchs v. Cristal Concrete Corp.*, No. 04-CV-1555, 2006 WL 2548169, at *8 (E.D.N.Y. July 18, 2006) (Boyle, M.J.). However, the occasional sharing of equipment and employees "do not demonstrate the complete interrelation of operations." *Mason Tenders Dist. Council of Greater N.Y. v. Fortune Interiors Dismantling Corp.*, No. 12-Civ-4253, 2015 WL 4503630, at *4 (S.D.N.Y. July 23, 2015) (denying summary judgment). Thus, there are factual disputes as to the extent of the companies' interrelation that would best be resolved by a jury.

The common management factor, described above in this opinion's section on controlled groups, favors the Plaintiffs, in that Tommy Vaughan owned both companies when he was alive, and now his sons own all of Happy Time; more than half of TEV; and they exercise all voting power over TEV. ECF 33-17 at 239, 299. However, this factor is "generally accorded less weight by courts." *Ferrara*, 904 F. Supp. 2d at 263; *see Trs. of Elevator Constructors Union Local No. 1. Annuity and 401(K) Fund v. K.A.N. Elevator, Inc.*, No. 16-Civ-7408, 2018 WL 2727884, at *8 (S.D.N.Y. June 5, 2018). Accordingly, the Court assigns it limited weight here.

As to centralized control of labor relations, courts look to the following factors:

> whether the companies have separate human resources departments and whether the entity establishes its own policies and makes its own decisions as to the hiring, discipline, and termination of its employees. . . . Other relevant factors include whether employment applications are sent to the other entity, whether the other entity must clear all major employment decisions, and whether the entities shift employees back and forth.

*Finkel v. Frattarelli Bros.*, No. 05-CV-1551, 2008 WL 2483291, at *11 (E.D.N.Y. June 17, 2008) (internal quotation marks, alterations and citations omitted). There are questions of fact here. While the companies have the same owners and share employees, it is unclear to what extent the companies made hiring, disciplinary, or termination decisions in coordination with one another, and the Plaintiffs have offered no evidence in support of this issue. *See Ferrara*, 904 F. Supp. 2d at 263.

As to whether the two companies form an employee bargaining unit, the Court's attention "shifts from the control, structure and ownership of the employer to the community interests of the employees." *Id.* at 264 (internal quotation marks omitted); *see also Gesualdi v. Fazio*, No. 16-CV-5209, 2017 WL 8794775, at *7 (E.D.N.Y. Dec. 12, 2017) (Lindsay, M.J.), *adopted sub nom. Gesualdi v. Difazio*, No. 16-CV-5209, 2018 WL 1202640 (E.D.N.Y. Mar. 8, 2018). Courts thus "look for a 'community of interests' among the relevant employees, and 'factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange.'" *Brown*, 250 F.3d at 128 n.2 (citations omitted). For instance, courts in this district have ruled that employees are part of a single bargaining unit where the "contributions sought [were] from the same job classification . . . and for the same type of work," *Bourgal*, 969 F. Supp. at 863, where the employees perform the same type of work in the same geographical area, *Ferrara*, 904 F. Supp. 2d at 264, and where the companies had similar working conditions and exchanged employees who performed the same job, *Trs. of Mosaic and Terrazzo Welfare, Pension, Annuity and Vacation Funds v. High Performance Floors, Inc.* ("*High Performance Floors*"), 233 F. Supp. 3d 329, 335 (E.D.N.Y. 2017).

This factor favors the Plaintiffs. They have sufficiently alleged that the two companies share employees in the same geographic region, and that they perform similar work. *See Ferrara*, 904 F. Supp. 2d at 264–65; *Labarbera v. Cretty Enterprises, Inc.*, Nos. 03-6112, 04-5178, 2007 WL 4232765, at *6 (E.D.N.Y. Nov. 28, 2007) ("It is undisputed that the employees of both Cretty and Asbestos perform the same job of driving trucks.").

In sum, questions of fact prevent the Court from awarding summary judgment against the Defendant companies based on the single employer theory. *See Trs. of Elevator Constructors Union Local Annuity and 401(K) Fund*, 2018 WL 2727884, at *9 ("Given that two of the single employer factors point in opposite directions, and the parties otherwise dispute material questions of fact, the evidence is not so one-sided as to preclude a reasonable factfinder from holding in favor of either party.") (internal quotation marks omitted); *see also Mason Tenders Dist. Council of Greater N.Y.*, 2015 WL 4503630, at *4.

### c. The *Alter Ego* Standard

"The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'" *Ret. Plan of UNITE HERE Nat'l Ret. Fund*, 629 F.3d at 288 (quoting *Newspaper Guild of N.Y. v. NLRB*, 261 F.3d 291, 298 (2d Cir. 2001)). "Determining that an entity is an alter ego 'signifies that, for all relevant purposes, the non-signatory is legally equivalent to the signatory and is itself a party to the [collective bargaining agreement].'" *Id.* (quoting *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004)). An *alter ego* analysis considers "whether the enterprises under review have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Bourgal*, 969 F. Supp. at 863. (internal quotations

omitted).  The *alter ego* doctrine is "conceptually distinct" from the single employer doctrine.
*Id.*

The Second Circuit applies a flexible test to determine *alter ego* status that weighs the circumstances of each individual case.  *Trs. of Laborers Union Local No. 1298 of Nassau and Suffolk Ctys. Ben. Funds v. A to E, Inc.*, 64 F. Supp. 3d 435, 439 (E.D.N.Y. 2014) (Spatt, *J.*) (citing *Goodman Piping Prods., Inc.*, 714 F.2d at 11).  Courts typically look to the following factors: "'(1) the absence of the formalities which are part and parcel of normal corporate existence, i.e., the issuance of stock, the election of directors, the keeping of corporate records, etc., (2) inadequate capitalization, (3) personal use of corporate funds, and (4) the perpetration of fraud by means of the corporate vehicle.'"  *Id.* (quoting *Ferrara*, 904 F. Supp. 2d at 260 (citation and internal quotation marks omitted)).  "[S]ummary judgment of alter ego status is appropriate where the undisputed facts show that the two entities have identical management, supervision, and ownership, engage in substantially the same type of work, lease [ ] identical office space . . . and use[ ] many of the same business institutions, and one company actually took over contracts originally awarded to the other."  *Castaldi v. River Ave. Contracting Corp.*, No. 14-CV-5435, 2015 WL 3929691, at *3 (S.D.N.Y. June 22, 2015) (internal quotation marks omitted).

The Court rules that, in addition to being members of the same controlled group, that TEV and Happy Time are *alter egos* of one another.  As noted above, both companies had the same owners during Tommy Vaughan's life, and today, the Vaughan brothers own all of Happy Time and effectively own TEV, although TEV has another part-owner.  The parties do not dispute that the two companies would park their trucks in the same location, and that drivers would call the same phone number when trying to contact either company.  *See High Performance Floors*, 233 F. Supp. 3d at 338 ("Two entities may be found to have a common

business purpose when, for example, the principal work they perform is the same, particularly when that work is performed in the same geographic area."). The parties also do not dispute that among the various employees the two companies shared, that some of them would use the same truck when working for either company. *See Bourgal*, 969 F. Supp. at 863 (noting that sharing common facilities and equipment are "significant circumstantial evidence of both single employer and alter ego status").

The record also shows that the same outside accountant performed the taxes for the two companies. ECF 33-16 at 338–39. Further, while only one of the companies performed union work, this is insufficient to dispute *alter ego* status. *See High Performance Floors*, 233 F. Supp. 3d at 338 ("Minor distinctions in the work performed are not dispositive; thus, differentiating among entities by pointing out that one performs union work and the other does not will not defeat a finding of common business purpose.") *see also Plumbers, Pipefitters and Apprentices Local Union No. 112 Pension, Health and Educ. Apprenticeship Plans v. Mauro's Plumbing, Heating and Fire Suppression, Inc.*, 84 F. Supp. 2d 344, 349 (N.D.N.Y. 2000).

### C. Damages

Having found that the Defendants are jointly and severally liable for the withdrawal liability to the Fund, the Court now turns to the Plaintiffs' request for damages, as well as for attorneys' fees and costs. The Plaintiffs assert that the Court should hold the Defendants jointly and severally liable for $2,717,684 in withdrawal liability principal; $708,980.47 in interest on the withdrawal liability principal; liquidated damages of $708,980.47 through May 15, 2019 (the date after the filing of the summary judgment motion); liquidated damages of $1,340.23 for each day thereafter through judgment entry; and unspecified attorneys' fees and costs. ECF 33-2 at 22–24. As to attorneys' fees and costs, the Plaintiffs allege that "[a]s legal fees continue to

accrue, the Trustees are prepared to supplement their filings if the Court awards the Fund summary judgment as to the amounts claimed due." *Id.* at 24.

"In any action to collect withdrawal liability 'in which a judgment in favor of the plan is awarded, the court shall award the plan' in addition to the unpaid withdrawal liability, reasonable attorney's fees and costs, interest, and liquidated damages." *UNITE Nat'l Ret. Fund v. Veranda Mktg. Co.*, Nos. 04-Civ-9869, 06-Civ-0055, 2009 WL 2025163, at *4 (S.D.N.Y. July 13, 2009) (quoting 29 U.S.C. § 1132(g)(2)); *Nat'l Pension Plan of the UNITE HERE Workers Pension Fund*, No. 05-Civ-6819, 2006 WL 1292780, at *4 (S.D.N.Y. May 11, 2006). These are mandatory remedies. *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp. 2d 361, 379 (E.D.N.Y .2013).

Accordingly, the Court finds that the Defendant companies are jointly and severally liable for the withdrawal liability principal; interest due on that principal; liquidated damages; and reasonable attorneys' fees and costs. Pursuant to 28 U.S.C. § 636(b)(1)(B), the Court hereby refers the matter to United States Magistrate Judge A. Kathleen Tomlinson for a recommendation as to the amount of damages owed, as well as the proper award for attorneys' fees and costs. The Plaintiffs are also directed to file an application for attorneys' fees and costs to Magistrate Judge Tomlinson.

### III. CONCLUSION

For the foregoing reasons, the Court grants the Plaintiffs' Rule 56 motion, and finds that the Defendant companies are jointly and severally liable to the Plaintiffs for damages, attorneys' fees, and costs. The Court dismisses the action, without prejudice and with leave to re-file, as to the John Doe Defendants, The Court refers the matter to United States Magistrate Judge

Tomlinson for a recommendation as to the amount of damages, attorneys' fees, and costs owed.

The Court further directs the Plaintiffs to file an application for attorneys' fees and costs.

It is **SO ORDERED.**

_____      /s/ Artur D. Spatt _____                    _____January 31, 2020_____

            Arthur D. Spatt, U.S.D.J.                                                                    Date